**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **No. 23-cr-238 (RCL)** |
| | **:** | |
| **DEMARCO DIGGS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Memorandum in Aid of Sentencing. On November 14, 2023, the Defendant, Demarco Diggs, pleaded guilty to a two-count Indictment, charging him with one count of Engaging in the Business of Dealing in Firearms Without a License, in violation of 18 U.S.C. § 922(a)(2)(A), and one count of Illegal Transport of a Firearm, in violation 18 U.S.C. § 922(a)(5).

The Defendant purchased and then illegally distributed firearms to individuals he knew or should have known were disqualified from owning them as a result of prior criminal convictions. In fact, persons who are legally barred from buying and possessing firearms were the Defendant's target audience. The firearms he trafficked into the DC area were then—predictably—used by criminals to endanger the safety of the community. The Defendant continued his reckless sale of guns for close to two years, even after he was confronted by law enforcement, in pursuit of personal profit and without regard to the law and the risk to the public.  For the reasons explained herein, and based on the 18 U.S.C. § 3553(a) factors, a sentence of 30 months' incarceration followed by 24 months of supervised release is appropriate.

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

    A.   <u>Defendant's Known Firearm Purchases from Federal Firearm Licensees and Statements Made to the ATF</u>

Between September 2021 and November 2022, law enforcement recovered four firearms in the DC, Maryland, and Virginia ("DMV") region. Law enforcement's investigation into these recovered firearms revealed that they were all purchased by the Defendant in June 2021 from a gun store in Georgia, which is where the Defendant resided at the time. Further investigation into the Defendant's firearm purchasing history revealed that the Defendant purchased at least twenty firearms between December 2020 and July 2021. This record of purchases is limited to those made from a Federal Firearm Licensee (FFL) and does not include purchases from non-FFL sources. Additionally, because there is no centralized FFL records repository, it is possible that the Defendant purchased additional firearms from FFLs that were not identified. Payment records from the Defendant's bank account indicate that from February to July 2021, the Defendant spent over $8,600 on firearms and firearms-related purchases.

When the Defendant was interviewed by an ATF special agent on December 28, 2022, about his knowledge of firearms that he purchased which were later recovered in the DMV, the Defendant admitted to selling firearms. The Defendant also made statements indicating that he had taken firearms purchased outside of Washington, DC into the District of Columbia, which he claimed were stolen from him. The Defendant stated that he reported the theft to police, but law enforcement was unable to locate any corresponding police report. Additionally, the Defendant stated that he did not use social media, including to sell firearms. But this was false: prior to the interview, the ATF was already aware of the Defendant's then-publicly viewable Instagram account, which featured multiple photos of firearms.

B. <u>Search of Defendant's Instagram Reveals Evidence of Firearms Dealing and Trafficking</u>

On January 20, 2023, a search warrant was issued for the Defendant's Instagram account. A review of the messages sent to and from the account revealed evidence of the Defendant soliciting customers in the DMV area to sell them multiple firearms for profit. These messages also contained photos of firearms that the Defendant was seeking to sell. Examples are pictured below:





As acknowledged in the Statement of Offense, Instagram messages indicate that the Defendant traveled from Georgia to the Washington, DC Metropolitan Area in the June and July 2021 timeframe to sell firearms to multiple individuals. ECF No. 31 at 3. Additionally, as agreed

in the Statement of Offense, Cash App records for the Defendant indicate that he received payments in amounts consistent with firearms sales during that same timeframe. *Id.*

Instagram messages on the Defendant's account not only show that he was dealing in firearms, but also that he was soliciting interested buyers who were prohibited from purchasing firearms. In one Instagram message conversation on June 14, 2021, an interested buyer told the Defendant, "You kno [sic] I can't go in no gun store." The Defendant responded by giving the interested buyer a price for a firearm, and after the interested buyer asked the Defendant to "[p]ut it to the side for me," the Defendant responded, "Big bet ima hit u up when I get back in the dmv." ECF No. 6 at 5-7. In another Instagram message exchange with a different user on June 27, 2021, the Defendant told the user that he is coming to DC and discusses the firearms that he is interested in selling, including "11 or 12" firearms. *Id.* at 9. The user told the Defendant that his prices are too high, to which the Defendant responded, "I told you i can come down on them a bit but these are for people that cant get them on there [sic] own." *Id.* at 11.

C. Residential Searches and Search of Defendant's Cell Phone Reveal Evidence of Firearms Straw Purchasing, Dealing, and Trafficking, and Uncover Additional Firearms

On March 24, 2023, law enforcement executed a search warrant at the Defendant's and the Defendant's brother's residences in Aurora, Colorado. In the Defendant's brother's residence, law enforcement recovered four firearms, at least two of which the Defendant had purchased. Law enforcement also recovered four gun boxes with serial numbers, including two boxes matching two of the firearms recovered in the DC metropolitan area. From the Defendant's residence, law enforcement recovered three firearms, ammunition and magazines, and the Defendant's cell

phone. Photographs of some of the firearms and ammunition recovered from the residential searches are displayed below.

  

A subsequent search of the Defendant's cell phone revealed further evidence of the Defendant trafficking firearms and straw purchasing, including for persons who were barred from purchasing firearms. In one conversation with another individual with the contact name "Torres" on February 17, 2023, the Defendant tells Torres that he is going to a gun convention which requires valid state identification and a clean background check to purchase firearms, and warns Torres, "if you have had violent crimes and or domestic crimes then you will be automatically denied." *Id.* at 15. Torres then asked, "So you're willing to get me a gun under your name¿ [sic]" and the Defendant responds by saying, "Yep." *Id.* at 15-16. The Defendant also said, "All my guns are under my name," "Including the ones I already sold you." *Id.* at 16. Torres has been identified and is a convicted felon.

Later messages indicate that the Defendant visited a gun show, purchased a firearm, and reached an agreement to sell that firearm to Torres for $600. However, Torres was unable to travel to the Defendant to complete the transaction, and when Torres reached back out on March 14,

2023, to see if the Defendant still had the firearm, the Defendant informed him that he had already sold the firearm. *Id.* In another message thread with another individual stored on the Defendant's cell phone, the Defendant said on February 15, 2023, that he had already sold Torres two or three weapons. *Id.* at 17. In messages with this other individual, the Defendant appeared to arrange firearms sales, and discussion about selling guns continued into March 2023 when the cell phone was seized. *Id.*

Additional messages stored on the Defendant's cell phone revealed that he knew he was engaging in illegal activity. In a stored message from December 29, 2021, the Defendant told another individual "what im worried about is I got all these illegal as guns in my fucking house. That dumb bitch about to get me put in jail because she wanting to be stupid." Communications and transactions found on the Defendant's phone also reveal that the Defendant had reason to know that he was selling firearms to individuals who sought firearms for unlawful purposes. One such individual, who lived in DC, asked the Defendant on March 6, 2022, whether he "got a throw away strap," which law enforcement understands to mean a gun which can be used for crime and then discarded. This same contact asked the Defendant on April 27, 2022, ". . .when you putting another order in," to which the Defendant responded, "Bruh I don't live in ga no more lol." The contact then asked for a "number of whole sell." Law enforcement understand this exchange to be about the Defendant purchasing firearms in Georgia for the DC-based individual, who paid the Defendant $600 on July 2, 2021. Investigators also found transactions between the DC-based individual and previously identified members of the Butler Gardens Crew in DC, including one person who possessed one of the firearms recovered in DC. Investigators also found that the

Defendant called this DC-based individual after the ATF interviewed the Defendant on December 28, 2022.

Photographs contained on the Defendant's cell phone pictured at least six weapons that are unaccounted for in the Defendant's FFL purchase history obtained by law enforcement. Two of these weapons were later determined to have been purchased by the Defendant at gun shows on or about February 5, 2022, and on February 17, 2023, respectively.

D. Defendant's Purchased Firearms Recovered in the DMV Area in Six Separate Incidents

Between September 2021 and September 2023, law enforcement recovered six firearms purchased by the Defendant on six separate dates and locations in the Washington, D.C. Metropolitan area. The six firearms recovered firearms were:

(1) a Taurus G2S, .9mm pistol; serial number ACD835849 ("Recovered Firearm 1");

(2) a Glock 43, .9mm pistol; serial number AFNM307 ("Recovered Firearm 2");

(3) a Taurus GX4, .9mm pistol; serial number 1GA05702 ("Recovered Firearm 3");

(4) Century Arms Canik TP9SF, .9mm handgun; serial number 21AT16225 ("Recovered Firearm 4");

(5) a Glock/19 Gen 5, .9mm pistol; serial number BTDH009 ("Recovered Firearm 5"); and

(6) a Ruger EC9s, .9mm pistol; serial number 459-41883 ("Recovered Firearm 6").

As described in greater detail below, these firearms were recovered from convicted felons, found abandoned in public, or dropped by individual(s) fleeing police, and some have been connected to prior discharges and shooting incidents, all throughout the DMV region.

On September 15, 2021, Metropolitan Police Department ("MPD") officers responded to 1538 Butler St. SE, Washington, DC, in reference to sounds of gunshots. Law enforcement viewed video footage of individuals shooting firearms from in between several parked vehicles. Officers

ultimately recovered two firearms from a car from which one individual, a convicted felon, was seen on surveillance video retrieving firearms. One of the firearms was Recovered Firearm 1. The ATF completed a firearm trace request, which showed Recovered Firearm 1 was originally purchased by the Defendant on or about June 11, 2021—merely 96 days before its recovery—from CRC Guns & Weaponry in Savannah, GA ("CRC") as part of a sale involving multiple firearms.

On May 14, 2022, the Arlington County Police Department was called to respond to a shoplifting incident at Nordstrom located at 1201 S Hayes St., Arlington, VA involving a suspect who was also a convicted felon. Officers seized Recovered Firearm 2 from the suspect. Trace results for this firearm showed that the pistol was also purchased by the Defendant on or about June 7, 2021, from CRC as part of another sale involving multiple firearms. NIBIN data linked casings from the test fire of Recovered Firearm 2 to a casing recovered on the crime scene of an unlawful discharge at 1601 New York Ave NE, Washington DC, on February 27, 2022.

On September 25, 2022, MPD officers recovered Recovered Firearm 3 at 1512 Neal St. NE, Washington, DC. Maintenance staff for this property initially found the abandoned firearm. A firearm trace showed, again, that the firearm was originally purchased by the Defendant on or about June 18, 2021, from CRC as part of a multiple-firearm sale. NIBIN data linked the casings from the test fire of Recovered Firearm 3 to a casing recovered from a shooting that occurred on August 27, 2022, in Oxon Hill, MD, where a victim was shot in the leg.

On November 28, 2022, MPD executed a search warrant on 1538 Butler St SE, #101, Washington, DC. Among other things, officers seized Recovered Firearm 4 from the apartment. Following the execution of the search warrant, law enforcement arrested Quinton McLean, a convicted felon, in relation to the firearm recovery. A firearm trace again revealed that the firearm was originally purchased by the Defendant on June 30, 2021, from CRC as part of a multiple-

firearm sale. On August 30, 2023, McLean was sentenced to 34 months imprisonment and 36 months of supervised release after pleading guilty to one count of Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding a Year.

On September 2, 2023, MPD officers from the Violent Crime Suppression Division's Robbery Suppression Unit (RSU) conducting robbery interdiction in the 5th District observed an individual make a quick ducking motion towards the ground besides a parked vehicle outside of 330 Adams St. NE, Washington, DC. An officer inspected the area and found Recovered Firearm 5, loaded with one round in the chamber and 13 in the magazine. A firearm trace revealed that Recovered Firearm 5 was originally purchased by the Defendant from CRC on April 29, 2021.

A day later, on September 3, 2023, RSU officers pulled into a parking lot of Fort Greble Park by 211 Elmira St. SW, Washington, DC, and saw a large group of individuals congregating on a basketball court. As officers approached the group, multiple individuals fled and left behind multiple firearms and ammunition, including Recovered Firearm 6. A firearm trace conducted for Recovered Firearm 6 revealed that it was originally purchased by the Defendant on June 27, 2021 from the Palmetto State Armory in Savannah, Georgia.  NIBIN data for Recovered Firearm 6 is linked to a property damage incident which occurred in Prince George's County, Maryland on October 7, 2022.

E. Procedural Background

On July 20, 2023, the Defendant was indicted by a United States District Court for the District of Columbia grand jury on one count of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License) and one count of 18 U.S.C. § 922(a)(5) (Illegal Transport of a Firearm). On October 15, 2023, the Defendant signed a Statement of Offense which,

among other admissions, states that: (1) the Defendant did not have a license to sell or deal in firearms during all relevant time periods; (2) the Defendant engaged in the business of selling firearms and sold, or offered for sale, between eight and 24 firearms, from on or about June 2021 to March 2023; and (3) the Defendant traveled from his then-residence in Georgia to Washington DC, on or about June and July 2021, with firearms, and knowingly and willfully sold firearms to at least one person in Washington, DC, knowing that the purchaser resided within Washington, DC. ECF No. 31 at 4. On November 14, 2023, the Defendant pleaded guilty to both counts in the Indictment, and agreed to forfeit 25 firearms and assorted ammunition.

## II.     LEGAL STANDARD

When determining the appropriate sentence, the district court should consider all applicable factors set forth in Title 18, United States Code, Section 3553(a).  *See United States v. Gall*, 128 S. Ct. 586, 596 (2007).  These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).

## III.    GUIDELINES CALCULATION

As the Government and the Defendant agreed to in the plea agreement signed on October 15, 2023 and accepted by the Court on November 14, 2023, a base offense level of 12 should apply per U.S.S.G. § 2K2.1(a)(7), and a four-level enhancement should also apply per § 2K2.1(b)(1)

because the Defendant agreed in the Statement of Offense to selling or offering to sell between eight and 24 firearms. A criminal history category of I should also apply.

In the plea agreement, the parties agreed that a four-level enhancement per U.S.S.G. § 2K2.1(b)(5) should also apply for the Defendant's firearms trafficking. A little over two weeks after the plea agreement was signed, and two weeks before it was accepted by the Court, the 2023 Sentencing Guidelines became effective. The 2023 Sentencing Guidelines now have multiple subsections within § 2K2.1(b)(5), including two new two-level enhancements and one five-level enhancement. These amendments illustrate the seriousness with which the United States Sentencing Commission—and Congress—takes crimes like the Defendant's.   Indeed, the Defendant's relevant conduct would qualify for the new five-level enhancement under § 2K2.1(b)(5)(C). The Government intends to honor the Guidelines range contemplated in the plea agreement, which applies only the four-level enhancement for firearms trafficking, and will not ask the Court to impose a sentence above that range; however, the Government submits that a sentence at the top end of the range contemplated in the plea agreement is appropriate.

A three-level reduction should be applied to the Defendant's guidelines range pursuant to U.S.S.G. § 3E1.1 for the Defendant's acceptance of responsibility and for providing timely notice of the Defendant's intention to enter a guilty plea, permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Applying the aforementioned criminal history category (I), base offense level (12), enhancements (8), and reductions (-3), the Defendant's Sentencing Guidelines range should be 24-30 months imprisonment.

## IV.    ARGUMENT

The United States recommends that the Court sentence the defendant to a term of 30 months' incarceration, followed by 24 months of supervised release, which is within with the estimated guidelines range in the parties' plea agreement, made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B).  Under the totality of circumstances, including the nature and seriousness of the offenses, the needs of the sentence, and the Sentencing Guidelines, the United States submits that the recommended sentence of incarceration serves the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

### A.    Nature And Circumstances of the Offense

As described in detail in the Factual Background, the nature and circumstances of the Defendant's offenses warrant the Government's recommended sentence.

#### 1.    *The Defendant Willfully Sold Guns to Criminals That Were Used in Crimes*

The Section 3553(a)(1) aggravating factor that the Court should weigh most heavily is the fact that the Defendant sold—and intended to sell—his firearms to individuals who are prohibited from possessing firearms, including convicted felons. This was key to his business model.

Furthermore, the Defendant served as a straw purchaser, using his previously clean record as a front to buy firearms for persons barred from doing so themselves. As described in the factual background, when one interested buyer reminded the Defendant over Instagram in June 2021 that he could not purchase firearms from a gun store, the Defendant proceeded to name a price and agree to sell him a weapon. In a conversation with another interested buyer over Instagram, the Defendant expressed his interest to sell "11 or 12" firearms. When the potential buyer told the Defendant that his prices were too expensive, the Defendant explained his intentions clearly, "I

told you I can come down on them a bit but these are for people that cant get them on there [sic] own."

The Defendant sent additional messages establishing that he sold firearms to individuals that he knew, or at the very least had reason to know, had criminal records, including offenses prohibiting them from buying firearms. When the Defendant told one such individual in February 2023 that he was going to a convention to buy guns, the individual (Torres) asked what was required to buy a gun at the convention. The Defendant said state identification and a clean background check. The Defendant then said, "But if you have had violent crimes and or domestic crimes then you will be automatically denied." The Defendant knew he was providing his buyers two different services: 1) procuring firearms, and 2) access to all types of weapons available to law-abiding individuals, through the Defendant's use of his then-clean criminal record for those without one.  After the Defendant specifically called out "violent crimes" and "domestic crimes" as crimes that bar an individual from being able to buy a firearm, Torres said, "So you're willing to get me a gun under your name" and the Defendant replied, "Yep." The Defendant added that the other guns he previously sold to Torres, a convicted felon, were under the Defendant's name. The Defendant then served as a straw purchaser for Torres, agreeing to go to a gun show to purchase a firearm for Torres, in the Defendant's name, at an agreed upon price.

The fact that the Defendant sought out and chose to buy firearms for prohibited persons shows the Defendant put public safety at risk for the sake of his own profit. The Defendant knew that the weapons he was purchasing were making their way into felons' hands, and he did not care about the danger his firearms dealing or trafficking would have on communities, including the DMV area where he chose to traffic firearms.

Sure enough, now six of the Defendant's purchased firearms have been recovered in multiple different neighborhoods in DC, in connection with six different incidents. These incidents include a September 15, 2021 shooting involving a convicted felon, a May 14, 2022 shoplifting incident involving a convicted felon, and the search of a convicted felon's apartment who pleaded guilty to a firearms offense. These convicted felons are also believed to be affiliated with the Butler/Cedar Gardens Crew, a crew based in the Butler Gardens/Cedar Heights neighborhood that experienced significant violent crime in 2022.

Three additional firearms that the Defendant purchased were also found abandoned on three different occasions in 2022 and 2023. NIBIN data linked to three Defendant-purchased guns recovered in DC were linked to (1) a prior unlawful discharge in DC; (2) a shooting in Oxon Hill, Maryland, where a victim was shot in the leg; and (3) a property damage incident in Prince George's County, Maryland. It was completely foreseeable that selling firearms to prohibited persons in the DMV area would lead to those guns being used in shootings and various other crimes in the region, and this foreseeable outcome unsurprisingly occurred.

The Defendant knew the danger he was exposing the DMV area to with his firearm sales and trafficking to prohibited persons, and yet he demonstrated no concern. When the ATF interviewed the Defendant in December 2022 and informed him that they were interested in learning about the firearms he purchased that were recovered in DC, he claimed that the weapons he brought to DC were stolen. Instead of this interview prompting the Defendant to stop selling firearms and purchasing them for convicted felons, the Defendant continued this activity into 2023. The Defendants' intentional, repeated selling of firearms to prohibited persons, undeterred by knowledge that the weapons sold were ending up in law enforcement's possession following

incidents, and resulting in at least six recoveries to date in DC, weigh strongly in favor of a significant sentence.

### 2. *The Defendant Trafficked a Significant Number of Firearms*

The second aggravating circumstance that the Court should consider in imposing a sentence is the number of firearms that the Defendant has admitted to being involved in selling and offering to sell—eight to 24. The Government is aware of the Defendant purchasing at least 20 firearms from FFLs between December 2020 to July 2021, which does not account for additional firearms that the Defendant may have also purchased from additional FFLs and other sellers, including at gun shows, and before and after this time period. The Government is aware of at least two additional firearms that the Defendant purchased at gun shows in 2022 and 2023, as well as at least four other firearms pictured in photographs on the Defendant's cell phone that the Defendant likely did not purchase from FFLs.  The Defendant has agreed to forfeit 25 firearms, including pistols, rifles, and shotguns, as well as an assortment of ammunition. The volume of firearms that the Defendant purchased, offered to sell, sold, and trafficked demonstrate that the Defendant did not just engage in one or a miniscule number of transactions, but rather sought to deal a considerable number of firearms to multiple different buyers.

### 3. *The Defendant Trafficked Guns Over Years*

The third aggravating factor that the Court should consider is the time period in which the Defendant was dealing firearms. The Defendant has admitted that his illegal solicitation and selling of firearms occurred from on or about June 2021 and continued until March 2023. This extended period of firearms dealing is indicative of the long-term level of thought, planning, and effort that the Defendant put into selling firearms that he purchased, including at the behest of prohibited buyers. The Defendant's offenses were not isolated or hastily made acts, but rather ones made over the course of at least 21 months to profit from the illegal sale of weapons. The only event that

appears to have potentially stopped the Defendant from trafficking firearms was law enforcement's search of his and his brother's residences and the seizure of firearms found within.

      B.    <u>The Need for the Sentence to Be Imposed</u>

The Government's recommended sentence would reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. 18 U.S.C. § 3553(a)(2). The Defendant has pleaded guilty to illegally dealing and transporting firearms, but he also bears responsibility for directing guns to those who the law bars from possessing firearms because of their demonstrated risk to the public. As described above, the Defendant's illicit business model was based on getting firearms to those who could not legally purchase them, including those who commit violent crimes. The Defendant knew he was selling weapons to individuals with a criminal record, and that this danger to communities was worth the profit he would make from the illicit sales.

The Defendant also sought out and solicited buyers in the DMV area, which, according to the PSR, is where the Defendant spent essentially all of his childhood. ECF No. 34 at 11. The Defendant transported and sold guns from Georgia into the DMV region with callous disregard for the predictable, dangerous ways that these firearms would be used in his hometown community. Washington, DC has experienced a significant rise in violent crime, increasing 39.5% between 2022 to 2023. *See 2024 Year-to-Date Crime Comparison*, Metropolitan Police Department, https://mpdc.dc.gov/page/district-crime-data-glance. The sheer number of guns in DC, and the ease with which prohibited persons can obtain them, is contributing to the city's struggles with violent crime. MPD recorded a 35.7% increase in the number of firearms recovered in 2023 compared to 2021—the period coinciding with the Defendant's firearms sales and trafficking. *Id.* Out-of-state gun sellers and traffickers, like the Defendant, who knowingly sell firearms to

prohibited persons, must be held accountable for not only the crimes that they commit directly, but also for the criminal activity that they facilitate with these sales. This is evidenced by the six firearms that law enforcement has recovered to-date in the DMV that were purchased by the Defendant.

A 30-month period of incarceration would also promote respect for the rule of law and serve the interests of deterrence by showing how seriously the Court takes the Defendant's conduct. As of late December 2022, the Defendant knew that law enforcement was onto his purchase and selling of firearms, including the firearms appearing in Washington, DC. The Defendant was undeterred by the ATF showing up to his house and asking him about his gun sales, and he lied to law enforcement about how his firearms ended up in DC and how he was not using social media. The only event that appears to have stopped the Defendant's continuous dealing of firearms was law enforcement's seizure of his weapons in March 2023. The Defendant's disrespect for the rule of law and rebuffing of law enforcement by continuing his illegal firearm sales into 2023 demonstrate the need for the length of incarceration that the Government proposes in its recommended sentence.

Two years of supervised release following sentencing is also appropriate to ensure that the Defendant is steered away from returning to dangerous practices with firearms. In addition to the photographs that the Defendant took and sent of his stocks of pistols and rifles, law enforcement also found the image below on the Defendant's phone from 2022. The photograph below appears

to be of the Defendant's daughter on a bed with large caliber, linked ammunition, which is typically used in belt-fed machine guns.



This photograph prompts concerns of whether the Defendant has a history of dangerously exposing children, including his own, to firearms and ammunition. The Defendant's conduct with firearms presented serious risk to the public and potentially to children around him. A term of supervised release is appropriate to diminish these risks after the Defendant serves a period of imprisonment.

C.    The Sentencing Guidelines and Sentencing Commission Policy Statements

In the parties' plea agreement, the parties agreed on the applicable criminal history category, base offense level, the four-level enhancement for the number range of firearms involved in the Defendant's offenses, and that the U.S.S.G § 2K2.1(b)(5) four-level firearms trafficking enhancement that was in existence at the time the plea agreement was signed should apply to the Defendant.

On November 1, 2023, the 2023 Sentencing Guidelines took effect, which included revisions to § 2K2.1(b)(5). One of these revisions was increasing the previous four-level enhancement in § 2K2.1(b)(5) to a five-level enhancement. The U.S. Sentencing Commission has

explained that this amendment was adopted in response to Congress' directive in the Bipartisan Safer Communities Act to the Commission to consider "an appropriate amendment to reflect the intent of Congress that straw purchasers without significant criminal histories receive sentences that are sufficient to deter participation in such activities and reflect the defendant's role and culpability." Pub. L. 117-159, § 12004(a)(5), 136 Stat. 1313, 1328 (2022). *See* Adopted Amendments to the Sentencing Guidelines, Apr. 27, 2023 (Reader Friendly Version), page 59, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf ("The new subsection (b)(5)(C) increases the enhancement from four levels to five levels to ensure straw purchasers and firearms traffickers meeting these criteria receive increased penalties as required by the directive"). The Sentencing Commission specifies that the enhancement is "tailored to apply to the most culpable defendants" who engage in both straw purchasing and firearms trafficking. *Id*.

The Defendant is the type of offender that both Congress and the Sentencing Commission intended to cover with this increased five-level enhancement. The Defendant lacks a criminal history, which is one of the reasons why he was able to be a successful straw purchaser, and he committed both straw purchasing and trafficking offenses. As the Commission noted in its explanation of its amendment to § 2K2.1(b)(5), the application notes' criteria that previously applied to subsection (b)(5) were revised and incorporated into the new subsection (b)(5)(C). *See id*. at 58. The 2021 § 2K2.1 (b)(5) enhancement applied to a Defendant trafficking and selling multiple firearms to categories of individuals who are also covered under the 2023 § 2K2.1 (b)(5)(C) enhancement.

Section 3553(a)(4)(A) requires the use of the guidelines in effect on the date the defendant is sentenced (except as provided in 18 U.S.C. § 3742(g)). However, the Government acknowledges

the Supreme Court's holding that the *ex post facto* clause applies to sentencing guideline amendments that subject the defendant to increased punishment. *See Peugh v. United States*, 569 U.S. 530, 533 (2013). The Government recognizes that this newly increased enhancement would increase the Defendant's guidelines range from 24 to 30 months to 27 to 33 months. Section 1B1.11 of the Sentencing Guidelines seconds that courts shall use the Guidelines Manual in effect on the date that the defendant is sentenced, however, it advises that the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed if the court determines that using the Guidelines Manual on the date of sentencing would violate the *ex post facto* clause.

Although the Government is requesting a sentence within the Guidelines range that was in effect at the time the plea agreement was signed, the Court should give weight to Congress and the Sentencing Commission deciding that individuals like the Defendant, involved in straw purchasing and firearms trafficking for persons who cannot own firearms, are deserving of stricter penalties than they were receiving on average in previous versions of the Sentencing Guidelines. *See* U.S.S.G. Amendment 819 (2023) ("Congress directed that the Commission shall review and amend its guidelines and policy statements to ensure that persons convicted of . . . offenses applicable to the straw purchases and trafficking of firearms are subject to increased penalties in comparison to those currently provided by the guidelines and policy statements . . . ."). The Government posits that its recommended sentence of 30 months incarceration, followed by 24 months of supervised release, is the most appropriate sentence. This sentence balances Congress and the Sentencing Commission's intent to provide stronger penalties for offenses like those

committed by the Defendant, with concerns about subjecting the Defendant to a higher guidelines range under the 2023 Sentencing Guidelines.

**V.      CONCLUSION**

For the foregoing reasons, the United States recommends that the Defendant, Demarco Diggs, be sentenced to 30 months' incarceration followed by 24 months of supervised release.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      /s/ *Ethan Cantor*
ETHAN CANTOR
Trial Attorney
D.C. Bar No. 90017597
601 D. Street NW
Washington, D.C.  20530
(202) 252-7499
Ethan.Cantor2@usdoj.gov

/s/ Adam L.D. Stempel
Adam L.D. Stempel
Special Assistant United States Attorney
D.C. Bar No. 1615015
601 D Street NW
Washington, DC 20530
202-252-6736
Adam.stempel2@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 5, 2024, a copy of the foregoing Memorandum was submitted via CM/ECF, which will transmit to counsel for the above-captioned defendant.

<u>/s/ *Ethan Cantor*          </u>
ETHAN CANTOR
Trial Attorney